Edna RICARDS, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 79-4442.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided Aug. 7, 1981.

As Amended Nov. 27, 1981.

---

1. The Honorable H. Kenneth Wangelin, Chief Judge, United States District Court for the Eastern District of Missouri.

J. Anthony Giacomini, Giacomini, Jones & Zamsky, Klamath Falls, Or., for plaintiff-appellant.

Jay Miller, Tax Div., Washington, D.C., argued for defendant-appellee; Gilbert E. Andrews, Chief Appellate Section, Washington, D.C., on brief.

Before CHOY and ALARCON, Circuit Judges, and BONSAL,* District Judge.

ALARCON, Circuit Judge:

Plaintiff Edna Ricards appeals from a judgment of the district court denying her claim for a refund of federal estate taxes and granting the Government's counterclaim for interest on the taxes owed. For the reasons stated below, we affirm the judgment of the district court.

---

* Hon. Dudley B. Bonsal, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. In a community property system, both wife and husband share equally in property acquired as a result of the labor or industry of either during the marriage. Each spouse, therefore, has a present, vested, one-half interest in any income earned by either spouse during marriage, as well as in any property acquired with those earnings. See M. Vaughn, *The Policy of Community Property and Inter-Spousal Transactions*, 19 Baylor L.Rev. 20, 26, 38 (1967) [hereinafter "Vaughn"], J. Cribbett, *Principles of the Law of Property* 88–89 (1962). In common law states, by contrast, wages earned during the marriage as well as property acquired with those earnings are considered the separate property of the earning spouse. See W. Reppy, Jr. and W. DeFuniak, *Community Property in the United States* 1 (1975); Vaughn, *supra* at 38. See generally S.Rep. No. 1013, 80th Cong., 2d Sess., 22 *et seq.* (1948), reprinted in [1948], U.S. Code Cong. & Ad. News, p. 1163 [hereinafter "S.Rep. 1013"].

## STATEMENT OF FACTS

In September of 1972, Edna and Kenneth Ricards ("the Ricards") changed their residence from California to Oregon to secure a less expensive base of operations for their cattle ranching business. While residents of California, the Ricards acquired certain California real and personal property, which they held as community property under California law ("the California property").[1]

About the time they moved to Oregon, the Ricards sold their California property and reinvested the bulk of the proceeds in Oregon real and personal property (hereinafter "the Oregon property"). The Ricards took title to the Oregon realty as tenants by the entirety;[2] they held the personalty as cotenants with a right of survivorship. Oregon is not a community property state.

Kenneth Ricards died on May 11, 1973, a resident of Klamath County, Oregon, and willed his interest in the couple's Oregon property to Mrs. Ricards. Mrs. Ricards was appointed executrix of Mr. Ricards' estate; in that capacity, Mrs. Ricards filed an Estate Tax Return on May 18, 1976. Pursuant to the Internal Revenue Code (IRC) 26 U.S.C. § 2040 et seq.,[3] the return excluded half of the value of the Ricards' interest in the Oregon property from Mr. Ricards'

2. Under Oregon law, a conveyance of real property to a lawfully married husband and wife creates a tenancy by the entirety unless a different intent is manifested by the document of conveyance. *Ganoe v. Ohmart*, 121 Or. 116, 118, 254 P. 203, 204 (1927); see *Adamson v. Adamson*, 273 Or. 382, 394–95, 541 P.2d 460, 466–67 (1975). For a description of the characteristic of this estate under Oregon law, see generally *Ganoe v. Ohmart*, 121 Or. 116, 254 P. 203 (1927).

3. In relevant part, I.R.C. § 2040 provides:
   (a) General rule.—The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or *as tenants by the entirety* by the decedent and spouse, ... except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth. ...

gross estate, on the ground that one-half of that property had been purchased with Mrs. Ricards' share of the proceeds from the sale of the California property. The propriety of that exclusion is not in dispute here. Mrs. Ricards also claimed a marital deduction under IRC § 2056[4] for the half of the property which had been purchased with Mr. Ricards' share of the proceeds.

The Internal Revenue Service (IRS) disallowed the marital deduction claimed under § 2056 and assessed the decedent's estate for unpaid federal estate taxes in the amount of $5,148, interest in the amount of $1,255, and delinquency penalties in the amount of $1,287, for a total of $7,690. Mrs. Ricards made an initial payment of $7,027 towards the assessment, leaving an unpaid balance of $663, and filed a claim for a refund of the amount paid. After the IRS denied her claim, she instituted this suit.

The district court held that the estate was not entitled to claim the marital deduction under § 2056. The court reasoned that Mr. Ricards' half interest in the Oregon property, even though his separate property under Oregon law, retained its character as community property for purposes of § 2056, and was therefore ineligible for the marital deduction. Because we conclude that the court's conclusion was correct, we affirm its judgment.[5]

## DISCUSSION

Section 2056 was designed to remedy the disparity between the favorable tax treatment accorded marital property in community property states and the less favorable tax treatment accorded marital property in common law states.[6] Prior to the 1942 Revenue Act, the estate tax burden fell heavily on households in common law states in which the decedent was the primary wage earner. In community property states, the surviving spouse possessed a present, vested, one-half interest in the couple's community property, including income earned by either spouse during the marriage and property acquired with that income. Federal estate tax law recognized the state law characterization of the surviving spouse's vested, one-half property interest; hence, the surviving spouse's half-interest in the

4. I.R.C. § 2056 provides in relevant part:
   (a) For purposes of the tax imposed by section 2001, the value of the taxable estate shall, except as limited by subsections (b) and (c), be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate.
   \* \* \* \* \* \*
   (c)(1)(A)
   (A) In general. The aggregate amount of the deductions allowed under this section (computed without regard to this subsection) shall not exceed the greater of—
   (i) $250,000, or
   (ii) 50 percent of the value of the adjusted gross estate (as defined in paragraph (2)).
   \* \* \* \* \* \*
   (c)(2)(A)
   (2) Computation of adjusted gross estate. (A) General Rule. Except as provided in subparagraph (B) of this paragraph, the adjusted gross estate shall, for purposes of subsection (c)(1), be computed by subtracting from the entire value of the gross estate the aggregate amount of the deductions allowed by sections 2053 and 2054.

5. As an alternative basis for its decision, the district court apparently held that an estate could not both deduct half the value of jointly owned property under § 2040 and also utilize the marital deduction under § 2056. We need not reach the correctness of this position, since the court's first ground of decision fully supports the result here. *See generally United States v. Crain*, 589 F.2d 996, 1001–02, n.9 (9th Cir. 1979); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

6. *See generally* S.Rep. 1013. The marital deduction is also applicable to separately held property in community property states. *U. S. v. Stapf*, 375 U.S. 118, 128, 84 S.Ct. 248, 255, 11 L.Ed.2d 195 (1963).
   In 1942, Congress attempted to equalize the treatment of marital property in community property and common law states by taxing community property owned at death according to the source of the property. Int.Rev.Code of 1939, §§ 811(d)(5), 811(e)(2), 811(g)(4), 56 Stat. 941, repealed (1948).
   The failure of the 1942 amendments to cure the estate tax disparity is outlined in S.Rep. 1013 at 26–27.

couple's community property was excluded from the value of the gross estate for federal estate tax purposes. By contrast, in common law states, the *entire* value of the adjusted gross estate passing to the surviving spouse was included in the decedent's taxable estate. The inequity created by the federal estate tax was substantial, since all of the marital property acquired with the deceased spouse's earnings were included in the taxable estate in common law states, while only half of that property was included in community property states. *See* S.Rep. 1013 at 26–28. Section 2056 attempts to equalize that disparity by providing a "marital deduction," which allows taxpayers in common law jurisdictions to transfer up to 50 percent of the value of their adjusted gross estate to their spouses tax free.[7] Community property is not eligible for the marital deduction under § 2056.[8]

As appellees point out, the disallowance of the marital deduction for community property creates an estate tax incentive for married couples in community property states to convert their community property interests into separate property interests. By converting community property into separate property a surviving spouse would obtain half of the "converted" community property as her or his separate property, and *also* claim the marital deduction on the decedent's half of the community property, which remains in the decedent's estate. *See Murphy v. CIR*, 342 F.2d 356, 359–60 (9th Cir. 1965). The ineligibility of community property for the marital deduction could thus be circumvented. To avoid that result, § 2056(c)(2)(C)[9] provides that separate property held at death by the decedent which was "converted" from community property "by one transaction or a series of transactions" is deemed to retain its character as community property for purposes of determining the marital deduction under § 2056. Thus, "converted" community property, like actual community property, is ineligible for the marital deduction.

## APPELLANT'S CONTENTIONS

Mrs. Ricards does not dispute that the marital deduction does not apply to community property or to "converted" community property. Her argument, rather, is that her husband's share of the Oregon property should not be regarded as "converted" community property under § 2056. She claims that the Treasury Regulation interpreting § 2056[10] draws a distinction between community property which is "converted into non-community property by a transaction or agreement between spouses *within the community property system itself*," and community property which is transformed

---

7. The legislative history of I.R.C. § 2056 indicates that Congress was primarily concerned with the inequities which arose when the decedent was the primary wage earner. *See, e. g.*, S.Rep. 1013 at 22–23, 26–28.

   Under § 2056, the marital deduction is computed by first determining the value of property passing from the decedent to his or her surviving spouse, and then allowing that amount to be deducted to the extent that it equals no more than 50 percent of the decedents "adjusted gross estate." The latter figure is ascertained by subtracting certain deductions for losses, debts and claims against the estate from the gross estate.

8. *See* I.R.C. § 2056(c)(2); S.Rep. 1013 (Part 2) at 19–21. Technically, this "ineligibility" is accomplished by requiring that the entire value of any community property held by decedent at the time of his or her death be subtracted from the decedent's gross estate. The marital deduction is then computed on the basis of the value of any other interest in property passing

to the surviving spouse. *See generally Surrey, Federal Taxation of the Family—The Revenue Act of 1948*, 61 Harv.L.Rev. 1097, 1122–25 (1948).

9. I.R.C. § 2056(c)(2)(C) provides in relevant part:

   (i) If after December 31, 1941, property held as such community property ... was by the decedent and the surviving spouse converted, by one transaction or a series of transactions, into separate property of the decedent and his spouse (including any form of coownership by them), the separate property so acquired by the decedent and any property acquired at any time by the decedent in exchange therefor (by one exchange or a series of exchanges) shall, for the purposes of clauses (i), (ii), and (iii) of subparagraph (B), be considered as "held as such community property."

10. Treas.Reg. 20.2056(c)–2 (1981).

into separate property "solely by operation of the applicable property law." We are told that because Oregon is not a community property state, the conversion of the proceeds from the sale of the Ricards' California community property into their Oregon non-community property was brought about "solely by operation of the applicable Oregon property law." Hence, under § 2056 and its interpreting regulations, the decedent's share of the Oregon property must be treated as the decedent's separate property.

Alternatively, Mrs. Ricards argues that the disallowance of a marital deduction on her husband's share of the Oregon property violates her right to equal protection of the laws under the fifth amendment. Both of these contentions are without merit.

## ANALYSIS

In our view, the district court correctly found that the Oregon property must be regarded as community property for purposes of § 2056.

First, the language of § 2056 is unequivocal: Where community property is "converted" by "one transaction or a series of transactions" into separate property, the separate property is treated as community property for purposes of the marital deduction. Moreover, " 'Conversion' [in § 2056(c)(2)(C)] includes *any* transaction or agreement which transforms property from a community status into a non-community status." (Emphasis added), Treas.Reg. 20.-2056(c)(2)–(e). *See* S.Rep. 1013 (Part 2) at 21.

The sale and purchase of property involved in this case clearly constituted a "transaction or series of transactions", as that term is ordinarily understood, and as it is presumably used in § 2056(c)(2)(C).[11] The

Ricards sold their California property and purchased property in Oregon with the sale's proceeds. The sale and subsequent purchase altered the legal relationship between buyer and seller in each case. The sale and purchase also altered the legal relationship between Mr. and Mrs. Ricards, as it altered the manner in which they held title to their jointly held property. The sale and subsequent purchase were voluntarily undertaken by the Ricards in the context of conducting and enhancing their farm business. These actions bear all the indicia of "transactions" as that word is commonly understood. Thus, because the Oregon property was converted from community property into separate property through a "series of transactions," it must be treated as community property for purposes of § 2056.

Nevertheless, Mrs. Ricards suggests that only conversions of property which occur within the community property system itself are within the purview of § 2056(c)(2)(C). Appellant cites the following portion of Treasury Regulation 20.-2056(c)–2(e) in support of her position:

(e) The characteristics of property which acquired a non-community instead of a community status by reason of an agreement (whether antenuptial or postnuptial) are such that section 2056(c)(2)(C) classifies the property as community property of the decedent and his surviving spouse in the computation of the "adjusted gross estate." *In distinguishing property which thus acquired a non-community status from property which acquired such a status solely by operation of the applicable property law, section 2056(c)(2)(C) refers to the former category of property as "separate property" acquired as a result of a conversion of "property held as such community prop-*

---

**11.** In interpreting the term "transaction" in § 2056, we accord it its ordinary, commonsense meaning. *Malat v. Riddell,* 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). Black's Law Dictionary defines a transaction as:

[The] [a]ct of transacting or conducting any business.... It *may involve selling,* leasing, borrowing, mortgaging or lending.... *It*

must therefore consist of an act or agreement, or *several acts* or agreements *having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered.*

Black's Law Dictionary 1341 (5th Ed. 1981). *See also Fouchek v. Janicek,* 190 Or. 251, 265–66, 225 P.2d 783, 790 (1950).

erty." As used in section 2056(c)(2)(C), the phrase, "property held as such community property" is used to denote the body of property comprehended within the community property system. . . .

Under the regulation, separate property which acquires that status "solely by operation of the applicable property law" is considered separate property for purposes of § 2056. According to appellant, this means that where "the conversion of the community property into non-community property is by the law of a state *which is not within the community property system*," the property in question is not considered "converted" community property for purposes of § 2056. In our view, appellant's interpretation of the regulation is erroneous.

■ First, appellant's interpretation of § 2056 would create a substantial gap in Congress' scheme to equalize the estate tax burden on taxpayers in community property and non-community property states. Were we to uphold appellant's position, taxpayers with community property interests could circumvent the congressional scheme simply by exchanging their community property for separate property in non-community property states. We cannot judicially create such a substantial exception to § 2056, particularly in light of the Congress' clearly expressed intent to treat *any* transformation of community property into separate property as a "conversion" within the meaning of § 2056. *See* S.Rep. 1013 (Part

2) at 21. *See generally Muniz v. Hoffman*, 422 U.S. 454, 469, 95 S.Ct. 2178, 2187, 45 L.Ed.2d 319 (1975); *Tidewater Oil Company v. United States*, 409 U.S. 151, 167–68, 93 S.Ct. 408, 418, 34 L.Ed.2d 375 (1972).

Secondly, appellant's interpretation is at odds with certain revenue rulings dealing with § 2056. These revenue rulings, while not dispositive, are nevertheless entitled to consideration in our assessment of whether separate property acquired in a common law state with community property assets is "converted" community property for purposes of § 2056.[12] Under Revenue Ruling 78–391, separate property purchased in a common law state with the proceeds from the sale of community property in a community property state should be deemed to be "converted" community property, even though the laws of the common-law state regard the property as separate property.[13] Similarly, Revenue Ruling 68–80 holds that community property which is exchanged for property in a common law state is considered "converted" community property for purposes of § 2056.[14] See also Revenue Ruling 67–171, 1967–1 C.B. 274 (1967). These revenue rulings thus also contradict appellant's argument that only "conversions" of community property occurring within the community property system are within the purview of § 2056(c)(2)(C).[15]

■ Finally, appellant argues that § 2056(c)(2)(C) denies her equal protection of the laws. According to appellant, § 2056

---

**12.** A revenue ruling, as distinguished from a regulation or Treasury decision, does not have the force and effect of law. *See Idaho Power Co. v. Commissioner*, 477 F.2d 688, 696 n.10 (9th Cir. 1973), *rev'd on other grounds*, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974); *Merchants Indus. Bank v. Commissioner*, 475 F.2d 1063, 1064 (10th Cir. 1973). Nevertheless, they do constitute a body of experience and informed judgment to which courts may properly resort for guidance in the interpretation of relevant revenue statutes and regulations. *See St. Louis Bank for Cooperatives v. United States*, 624 F.2d 1041, 1050 (Ct.Cl.1980); *Groves v. United States*, 533 F.2d 1376, 1380 (5th Cir. 1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976); *see generally United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 858 (5th Cir. 1966), *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

**13.** Revenue Ruling 78–391, 1978–2 C.B. 245, specifically addresses the question of whether assets acquired with income from converted community property is deemed separate property for purposes of § 2056. In order to analyze that question, the status of the property purchased with community funds had to be resolved.

**14.** Revenue Rule 68–80, 1968–1 C.B. 348, specifically deals with the basis to which a surviving spouse is entitled under IRC § 1014(b)(6) for separately owned property which had been converted from community property.

**15.** Revenue Ruling 67–171, 1967–1 C.B. 274 (1967) suggests that the key phrase "solely by operation of the applicable property law" in Treas. Reg. 20.2056(c)–2(e) is intended to cover the situation in which income or rentals derived from converted community property are

disallows the marital deduction on the separate property willed to her by her husband because it is "converted" community property, yet allows that same deduction for all other separate property. Appellant suggests that the statute's unequal treatment of these different categories of separate property invidiously discriminates against taxpayers who inherit "converted" community property. This argument is without merit.

We recognize that the marital deduction does not completely succeed in equalizing the estate tax burden between residents in community property and non-community property states. However, so long as the statute's classificatory scheme has a rational basis, we must uphold its validity. *See United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970).[16] In this case, the legislative history of § 2056 affirmatively discloses that Congress had a valid and rational basis for disallowing the marital deduction for both community property and "converted" community property.[17] Appellant here offered no evidence to support her claim of invidious discrimination beyond the mere fact that the statute treats the two

treated as separate property by local property law. According to this revenue ruling, the underlying income-producing assets are treated as "converted" community property for purposes of § 2056. The income from those assets which is only indirectly traceable to the transaction or exchange by which the underlying assets were acquired, retains the local law's characterization as separate property for purposes of § 2056.

**16.** Some of the inequities created by the marital deduction are outlined in *Anderson, The Marital Deduction and Equalization under the Federal Estate and Gift Taxes Between Common Law and Community Property States*, 54 Mich.L.Rev. 1087 (1956). In particular, "only in the 'classic case,' that is, where the husband owns all the property at common law and he dies first, is equalization achieved." *Id.* at 1099. The legislative history of § 2056 suggests that Congress itself recognized this inequity when the marital deduction was enacted in 1948. *See* S.Rep. 1013 at 22, 26.

**17.** At the time § 2056 was enacted, Congress assumed that the husband was the sole or primary wage earner in the great majority of households. For example, in discussing the necessity for amending the estate and gift tax portion of the Tax Code, the Senate Report noted:

The basic differences between property rights in community-property and non-community-property States have also resulted in geographical inequalities in the effect of the estate and gift taxes. In community-property States husbands and wives have an undivided one-half interest in the community property. Prior to 1942, upon the death of a spouse his one-half interest in the community property, over which he had the power of testamentary disposition, was subject to the estate tax. Similarly, a gift of community property was taxable as though one-half of the value was the gift of the husband and one-half the gift of the wife. On the other hand, in common-law States neither spouse had an undivided interest in the property of the other spouse. Since both estate and gift taxes have sharply progressive rates, with large specific exemptions, the consequence was a substantially lower tax on transfers in community-property States than on transfers of similar size in common-law States, *where the usual case was that practically all the wealth of the married couple was the property of the husband.*

S.Rep. 1013 at 26, U.S. Code Cong. & Admin. News 1948 at 1188 (emphasis added).

Similarly, in discussing the need for equalizing the income tax burden between community property and common law property states, the Senate Report declared:

Under existing law the treatment accorded families earning the same amount of income is very different if they happen to live in States using the community-property system or in States which use common law. *Chiefly this is due to the* fact that *under the community-property system the earnings of a married couple are considered to be one-half the property of each. Income arising out of an accumulation which took place during the marriage is divided in the same manner, and in some community-property States the same division is made of income from assets which are the separate property of one of the spouses. No similar division takes place under common law. The earnings of the husband are his own and taxed to him. The income from his property is his income and is taxed as such.*

Since the rates applied under the income tax are steeply progressive, the same family income divided in two halves by community-property law will be taxed far less severely than in a common-law State where the whole income is apt to be taxed to one spouse. *The difference is greatest when the entire earnings of the couple in the common-law State are received by one spouse*, and when, under community-property law, none of the income

classes of separate property differently. Certainly on the record before us, there is no evidence that the statute's classificatory scheme is arbitrary and irrational.

AFFIRMED.

is the "separate" income of either spouse. Table XIII compares the tax due under these assumptions [i. e., where the husband is the sole wage earner] in community-property and common-law States under present law for incomes of various sizes.

This table shows that the difference between the tax due in community-property and common-law States appears as soon as the income of the couple rises above the first tax bracket, i. e., as soon as the rates become progressive. On a percentage basis the difference increases as the income grows larger. At $10,000 the couple in the common-law State pays a tax which is nearly 10 per cent greater than that paid in the community-property State. At $25,000 the tax in the common-law State is about 41 per cent larger. Thereafter, the percentage begins to decline as the marginal rate approaches the 85.5 per cent maximum. However, even on an income of $150,000 the tax in the common-law State is more than 21 per cent larger than that in the community-property State. At the opposite extreme is the case where in the common-law State incomes of the two spouses are approximately equal. Here, the results under common law and community-property would be similar. *However, in the great majority of cases the income of one spouse predominates.*

S.Rep. 1013 at 22, U.S. Code Cong. & Admin. News 1948 at 1184 (emphasis added; footnotes omitted).

While Congress' assumption concerning the percentage of households with two spouses working may have been correct in 1948, it is of questionable validity in 1981. Statistical information compiled by the Bureau of Census & the Department of Labor indicates that the percentage of households with two working spouses was no greater than 22 percent in 1948. *See e. g.,* Bureau of the Census, U.S. Department of Labor, Social Indicators III—Selected Data on Social Conditions and Trends in the United States, 355–56 (1980) (hereinafter "Social Indicators III"); U.S. Department of Labor and U.S. Department of Health & Human Services, Employment & Training Report of the President 1980 276–82 (1980) (hereinafter "1980 Training Report of the President"); U.S. Bureau of the Census, U.S. Census of Population: 1950, Vol. II, Part 1, 1–255—57 (1953). That percentage had risen to at least 43.7 percent in 1979. *See* Social Indicators III, *supra,* at 280. At least one report fixes the 1979 percentage at 55.6 percent. *See* 1980 Training Report of the President, *supra* at 356. On the limited record presented to us in this case, however, we cannot say that the marital deduction is without rational foundation.